IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


BILLIE J. WISDOM                     )
                                     )
v.                                   )        No. 3:11-1099
                                     )
CAROLYN W. COLVIN,                   )
        Acting Commissioner of       )
        Social Security[1]           )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying the plaintiff's claim for Disability Insurance Benefits ("DIB"), as provided by the Social Security Act.

Upon review of the Administrative Record as a whole, the Court finds that the Commissioner's determination that the plaintiff is not disabled under the Act is supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), and that the plaintiff's motion for "judgment on the pleadings" (Docket Entry No. 9) should be DENIED.


## I. INTRODUCTION

On May 6, 2009, the plaintiff protectively filed for DIB, alleging a disability onset date of August 26, 2003, due to bipolar disorder, depression, schizophrenia, panic attacks, hand tremors,

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Carolyn W. Colvin is substituted for former Commissioner Michael J. Astrue as the defendant in this suit.

dizziness, and balance problems.  (Tr. 12, 44, 49, 94-97, 127.)  Her application was denied initially

and upon reconsideration.  (Tr. 44-49, 53-55.)  The plaintiff appeared and testified at a hearing

before Administrative Law Judge Linda Gail Roberts ("ALJ") on June 16, 2011 (tr. 28-43), and on

June 27, 2011, the ALJ entered an unfavorable decision.  (Tr. 12-22.)  On September 21, 2011, the

Appeals Council denied the plaintiff's request for review of the ALJ's decision, thereby rendering

the ALJ's decision the final decision of the Commissioner.  (Tr. 1-3.)

## II. BACKGROUND

The plaintiff was born on August 31, 1962, and she was 40 years old as of her alleged

disability onset date.  (Tr. 31.)  She has a high school education and has worked as a cashier and

truck driver.  (Tr. 21, 31-32, 128, 135.)

### A. Chronological Background: Procedural Developments and Medical Records

#### 1. Physical Impairments

The plaintiff underwent laparoscopic gastric bypass surgery in 2003 after suffering from

morbid obesity and related complications including gastroesophageal reflux disease ("GERD"),

osteoarthritis, depression, and urinary incontinence.  (Tr. 193-95, 212-13.)  During a follow-up

examination in May 2004, the plaintiff reported to her surgeon, Dr. Hugh Houston, that she had

experienced "epigastric abdominal pain after eating pork." (Tr. 206.)  She also reported that she was

"stressed out secondary to marital problems and [thought] this [was] the problem."  *Id.*  In January

2006, the plaintiff presented to Dr. Houston with intermittent, significant left upper quadrant

abdominal pain and cramping.  (Tr. 203.)  A CT scan showed a possible small bowel obstruction,

and the plaintiff underwent a laparoscopic lysis of adhesions and repair of an internal hernia. (Tr. 190-92, 203-04.) In July 2006, she presented to the Centennial Medical Center emergency room with burning pain in her abdomen and pressure in her rectum. (Tr. 188-89.)

On September 13, 2006, Dr. Thomas Lewis, Jr., performed an esophagogastroduodenoscopy ("EGD"), which showed a two centimeter gastric pouch that was normal in appearance as well as normal anastomosis. (Tr. 233-34.) Dr. Lewis noted that he "did not see a structural cause for her symptoms." (Tr. 234.) After the plaintiff complained of headaches in July 2007, a head CT scan was normal. (Tr. 247.) In August 2007, the plaintiff presented to the Centennial Medical Center emergency room with nausea, vomiting, and abdominal pain radiating to her back. (Tr. 198.) A CT scan of her abdomen and pelvis was negative for bowel obstruction, internal hernia, or intraabdominal inflammation. *Id.*

The plaintiff was treated by Dr. Donald Cole from approximately September 2007 until December 2008 for abdominal pain, dumping syndrome, and diarrhea. (Tr. 268-92, 244-45.) On September 7, 2007, she reported that her "body [was] rejecting food and water" and that she had "nausea all the time." (Tr. 289.) A colonoscopy with biopsy on September 18, 2007, was positive for diarrhea, dumping syndrome, and an adenomatous polyp. (Tr. 244-45, 278-79.) On September 27, 2007, Dr. Cole noted that her dumping syndrome responded to medication before meals. (Tr. 278-79.) The plaintiff continued to complain of abdominal pain to Dr. Cole in November and December 2008. (Tr. 269-70, 277.) A CT scan and EGD were normal except for her previous gastric bypass surgery, and duodenal biopsies showed only mild inflammation. (Tr. 270, 273-75.)

The plaintiff was examined by Dr. Roy Johnson, a Tennessee Disability Determination Services ("DDS") consultative physician, on November 2, 2009. (Tr. 349-51.) During a physical examination, Dr. Johnson observed that the plaintiff was alert, oriented, well-nourished, well-developed, and in no acute distress. (Tr. 350.) She had tenderness to palpation in her spine at L4-L5, but she had full range of motion in her neck, back, shoulders, elbows, wrists, hips, knees, and ankles. (Tr. 350-51.) She was able to get on and off the exam table without assistance, perform straight leg raises in the seated and supine position, perform the heel walk, and "very briefly balance on each foot." *Id.* However, she could not perform the toe walk, and Dr. Johnson described her gait and squat-and-rise maneuver as "unsteady." (Tr. 351.) He diagnosed her with bipolar disorder, depression, schizophrenia, panic attacks, low back syndrome, status post CABG,[2] and possible vertigo. *Id.* He opined that she could occasionally lift twenty pounds, stand and walk 4-5 hours with normal breaks, and sit without limitations. *Id.* He also opined that she may need assistance "with long and prolonged standing and walking" and that "her work activity should not exceed any restrictions placed on her by her treating physicians." *Id.*

On November 18, 2009, Dr. James Millis, a nonexamining DDS consultative physician, completed a physical RFC assessment (tr. 352-60), opining that the plaintiff could lift and/or carry fifty pounds occasionally and twenty-five pounds frequently, stand and/or walk about six hours and sit about six hours in an eight hour workday, and push and/or pull without limitations. (Tr. 353.) He opined that she could frequently perform postural activities and had no manipulative, visual,

---

[2] As the defendant points out, CABG refers to "coronary artery bypass grafting." *See* Docket No. 11, at 4. Because the plaintiff did not undergo this procedure, the Court assumes that Dr. Johnson intended to indicate the plaintiff's status post gastric bypass surgery.

communicative, or environmental limitations except for the need to avoid all exposure to hazards, such as machinery and heights, due to vertigo.[3]  (Tr. 354-56.)

On March 15, 2010, the plaintiff presented to the StoneCrest Medical Center emergency room with dizziness.  (Tr. 374-96.)  A CT scan of her head was normal (tr. 391), and she was diagnosed with vertigo and prescribed Antivert.[4]  (Tr. 374, 376-77.)  On March 23, 2010, she presented to the University Medical Center emergency room after falling at her home and sustaining a right acetabular fracture.  (Tr. 399-400, 471-72.)  The hip injury was treated non-surgically, and she was discharged to a skilled nursing facility with instructions to keep weight off of her right lower extremity for three months by using a wheelchair or walker.  (Tr. 400, 402-03, 469-70, 554.)  After becoming "overwhelmed and depressed" at the nursing facility, she was discharged home and pursued physical therapy from March through July 2010.  (Tr. 473-546, 554.)  Following her injury, she developed bilateral lower extremity edema.  (Tr. 549, 561-63, 596-611.)

The plaintiff was treated by Dr. Elizabeth Maxwell from March 2010 until April 2011 for a number of ailments including hypothyroidism, malaise/fatigue, vertigo, dizziness, dysphagia, edema, back pain, neck pain, radiculopathy, senile osteoporosis, depressive disorder, and vitamin deficiencies.  (Tr. 415-23, 596-623, 638-47.)  A January 2011 MRI of her pelvis was normal except for prominent inguinal lymph nodes, and a lumbar spine showed mild spondylylosis "with no canal, foraminal stenosis or nerve root compression at any level."  (Tr. 643, 645.)  A scan of her bilateral lower extremities was also normal.  (Tr. 613, 646.)

---

[3] On February 19, 2010, Dr. William Downey, a nonexamining DDS consultative physician, "affirmed" Dr. Millis' assessment.  (Tr. 362.)

[4] Antivert is an anticholinergic, motion sickness preventative, and antivertigo medication. Saunders Pharmaceutical Word Book 56 (2009) ("Saunders").

## 2. Mental Impairments

The plaintiff began receiving outpatient mental health treatment at LifeCare Family Services in May 2007. (Tr. 236-38.) At her initial diagnostic interview on May 21, 2007, she complained of depression and anxiety stemming from complications with her gastric bypass surgery. (Tr. 238.) She explained that she had panic attacks when she tried to eat because eating caused nausea and vomiting. *Id.* Treatment notes indicated that it was "unclear" whether the plaintiff's "issues [were] "medical or psychosomatic, as doctors cannot find issues with physical makeup." *Id.* She reported having depressive symptoms following surgery including "crying, excessive sleep, laying on the couch all day, anhedonia, and frustration over her inability to work." *Id.* She reported an "extensive" history of physical and sexual abuse and related she had suicidal thoughts but had never attempted suicide. *Id.* She was diagnosed with panic disorder without agoraphobia and depressive disorder, not otherwise specified ("NOS"), and she was assigned a GAF score of 47.[5] (Tr. 236-38.) The plaintiff continued treatment with LifeCare through September 2007, during which time her diagnoses and assigned GAF score remained the same. (Tr. 239-42.) During this time, she was prescribed Buspar and Zoloft, which she reported were not helpful (tr. 239), Wellbutrin, which she

---

[5] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR"). A GAF score between 41-50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Id.*

could not tolerate due to gastrointestinal symptoms (tr. 242), Paxil, Xanax, and Celexa.[6]  (Tr. 239-42.)

The plaintiff was treated by Dr. Robert Jantz from October 2007 until March 2008.  (Tr. 261-66.)  In October 2007, the plaintiff complained to Dr. Jantz that she was experiencing nausea and anxiety attacks following her gastric bypass surgery.  (Tr. 264.)  In November 2007, Dr. Jantz observed that Effexor[7] "seem[ed] to be working well for anxiety" and that she "was doing well with Xanax until last week when her pet died."  (Tr. 263.)

In March and April 2009, the plaintiff presented to Dr. Wayne Wells for mental health treatment.  (Tr. 294-324.)  At her first visit on March 10, 2009, the plaintiff reported that she had "a new mood disturbance which ha[d] been present several months" and included symptoms of anxiety, insomnia, irritability, crying episodes, feelings of guilt, palpitation, and anger problems.  (Tr. 308.)  She reported that she performed "minimal exercise" by walking.  (Tr. 309.)  Dr. Wells diagnosed her with generalized anxiety disorder, post-traumatic stress disorder ("PTSD"), and bipolar disorder, unspecified, and he prescribed Phenobarbital/Belladonna alkaloids, Citalopram, Klonopin, and Lithium.[8]  (Tr. 311-12.)  On April 6, 2009, Dr. Wells reported that her "condition ha[d] worsened"

---

[6] Buspar is a nonsedative used to treat anxiety.  Saunders at 116.  Zoloft, Paxil, and Celexa are selective serotonin reuptake inhibitor ("SSRI") drugs used to treat depression, obsessive compulsive disorder, panic disorder, post-traumatic stress disorder, and various anxiety disorders.  *Id.* at 141-42, 536, 779.  Wellbutrin is an antidepressant.  *Id.* at 763.  Xanax is a sedative used to treat anxiety, panic disorder, and agoraphobia.  *Id.* at 768.

[7] Effexor is an SSRI used to treat anxiety and depressive disorders.  Saunders at 255.

[8] Phenobarbitol/Belladonna alkaloids are used as a sedative and gastrointestinal anticholinergic/antispasmodic.  Saunders at 551.  Citalopram is an SSRI for major depression.  *Id.* at 163.  Klonopin is an anticonvulsant and axiolytic for panic disorder and manic episodes of bipolar disorder.  *Id.* at 391.  Lithium is used to treat manic episodes of bipolar disorder.  *Id.* at 411.

with additional symptoms of insomnia, early morning awakening, nausea, and vomiting. (Tr. 294.) On April 13, 2009, she reported that she was "having problems with Lithium," including trembling and staggering. (Tr. 321.)

The plaintiff began mental health treatment with Genesis Psychiatric Services in April 2009 where she was seen primarily by Melissa Ott, APN. (Tr. 441-44.) At her initial evaluation, the plaintiff reported symptoms including anxiety, difficulty sleeping, loss of pleasure and motivation, excessive energy, poor concentration, excessive appetite, hyperactivity, paranoia, hallucinations, and feelings of helplessness, guilt, and shame. (Tr. 441-42.) She reported that Klonopin was helping, and she was diagnosed with bipolar I disorder, most recent episode mixed, severe without psychotic features. *Id.* In May 2009, the plaintiff reported that she was experiencing dizziness, thirstiness, bedwetting, and confusion but that her concentration and sleep had improved. (Tr. 445.) In June 2009, she indicated that she felt her medication was helping (tr. 448), but in July, she reported that she "[did not] feel the medication [was] working anymore." (Tr. 451.) She said that her hallucinations had returned and described having poor sleep, episodes of anger, decreased stamina, decreased motivation, and decreased task completion. *Id.* Ms. Ott assigned her a GAF score of 45. *Id.*

On July 21, 2009, Dr. Linda Blazina, Ph.D., a DDS psychological consultant, examined the plaintiff (tr. 325-28), and during a mental status examination, found her to be alert, oriented, and fully cooperative with a dysphoric mood and appropriate affect. (Tr. 325.) According to Dr. Blazina, the plaintiff did not demonstrate speech abnormalities, her language skills were intact, and her thought processes were logical and coherent. (Tr. 326.) The plaintiff reported having psychotic symptoms, including seeing people who were "trying to harm" her when she went to bed.

*Id.*  The plaintiff reported that she felt depressed and anxious, including symptoms of loss of appetite, lack of interest in activities, irritability, and feelings of guilt, hopelessness, and worthlessness, and she explained that she had been suicidal in the past.  *Id.*  She said that she "cannot get along with people" and had been "involved in verbal altercations with others in public in the past" and had recently "threatened to beat up a 300-lb man in Wal-Mart."  *Id.*

The plaintiff told Dr. Blazina that she was able to dress herself without assistance but sometimes required assistance while bathing, although, according to Dr. Blazina, "the reason . . . was unclear."  (Tr. 327.)  She said that she took her medications independently, was able to drive a vehicle without difficulty, load the dishwasher, take care of family pets, put away groceries, play games on a computer, and watch television.  *Id.*  She also said that she was able to cook food in a microwave once a week but did not cook on a stove because she would "forget to turn it off."  *Id.*  The plaintiff related that she was "able to shop in terms of selecting items and paying for them" but that she went shopping with her husband because she would "get too nervous," adding that she did "not manage money well" and that, approximately six months earlier, she began having problems with "buying things [she] just didn't need all of a sudden."  *Id.*

Dr. Blazina estimated the plaintiff's intellectual functioning to be in the low average range (tr. 326), and she diagnosed her with depressive disorder, NOS; anxiety disorder, NOS; intermittent explosive disorder, NOS; personality disorder, NOS; and recommended a rule out diagnosis for bipolar disorder, NOS.  (Tr. 328.)  She assigned the plaintiff a GAF score of 85[9] and opined that her

---

[9] A GAF score between 81-90 indicates "[a]bsent or minimal symptoms (e.g., mild anxiety before an exam), good functioning in all areas, interested and involved in a wide range of activities, socially effective, generally satisfied with life, no more than everyday problems or concerns (e.g., an occasional argument with family members)."  DSM-IV-TR at 34.

ability to understand and remember was not impaired; that her ability to sustain concentration and attention was "mildly to possibly moderately impaired;" and that her ability to adapt to changes and tolerate stress in the workplace was moderately impaired. *Id.* Additionally, Dr. Blazina opined that the plaintiff's "social interaction abilities are felt to be moderately to possibly severely impaired due to characterological issues and poor stress tolerance." *Id.* Finally, she opined that the plaintiff was able to make simple work-related decisions and transport herself independently. *Id.*

In August 2009, the plaintiff reported to Ms. Ott that she had stopped taking Invega[10] due to lethargy and that she had been "feeling better" since doing so. (Tr. 457.) In September, she reported that she had "little bouts of depression" but was "getting better." (Tr. 460.) In October, the plaintiff described having flashbacks from a domestic violence incident but also reported that her tremors had stopped after taking medication. (Tr. 463.) Ms. Ott diagnosed PTSD and assigned her a GAF score of 56.[11] *Id.*

On October 14, 2009, Dr. Robert de la Torre, Psy.D., a DDS nonexamining psychological consultant, completed a Psychiatric Review Technique ("PRT") and mental Residual Functional Capacity ("RFC") assessment. (Tr. 330-47.) In the PRT, Dr. de la Torre found that the plaintiff had bipolar disorder, depressive disorder, generalized anxiety disorder, personality disorder, and intermittent explosive disorder. (Tr. 333, 335, 337.) He opined that she had mild restrictions of the activities of daily living, moderate difficulties maintaining concentration, persistence, or pace, moderate difficulties maintaining social functioning, and no episodes of decompensation. (Tr. 340.)

---

[10] Invega is an anti-schizophrenic. Saunders at 373.

[11] A GAF score between 51-60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34.

In the RFC, Dr. de la Torre found that the plaintiff was markedly limited in her ability to interact appropriately with the general public and moderately limited in several categories related to sustained concentration and persistence, social interaction, and adaptation. (Tr. 344-45.) He explained that the plaintiff was able to "understand and remember simple and detailed instructions," "maintain attention and concentration for periods of at least two hours," "set goals independently," and "adapt to infrequent change." (Tr. 346.) Regarding her social abilities, he opined that she "cannot interact appropriately with the general public" and "will work better with things than with people" but "has the ability to interact appropriately with supervisors and peers."[12] *Id.*

In November 2009, the plaintiff told Ms. Ott that she was having spells of dizziness and crying and that she had not left the house in over a month. (Tr. 466.) In December, she reported that she had stopped taking Propranolol[13] after it made her dizzy and also reported having a decreased appetite. (Tr. 438.)

The plaintiff also pursued mental health therapy with Breanna Bell, MA, a senior psychological examiner, from December 2009 through March 2010. (Tr. 364-73.) Ms. Bell diagnosed bipolar disorder and provided therapy for a variety of issues including anxiety, agoraphobia, and past abusive relationships. *Id.* In December 2009, the plaintiff described herself as "more lethargic [and] off balance" while taking Lithium. (Tr. 368.) In March 2010, she said that she was feeling better and credited her therapy sessions for the improvement. (Tr. 364.)

---

[12] On February 11, 2010, Dr. Brad Williams, a nonexamining DDS consultative physician, "affirmed" Dr. de la Torre's assessment. (Tr. 361.)

[13] Propranolol is an antianginal, antiarrhythmic, and antihypertensive and is also used as a migraine preventative. Saunders at 588.

On January 6, 2010, Ms. Ott completed a Medical Source Statement in which she opined that the plaintiff could not work a full-time job due to "extreme" anxiety, "severe" depression, and "common" occurrences of nightmares, hypervigilance, and flashbacks. (Tr. 425-28.) Ms. Ott opined that the plaintiff had a poor ability to perform the activities of daily living; fair to poor ability to engage in social functioning; poor abilities of concentration, persistence, and pace; poor ability to adapt to stressful circumstances in work-like settings; poor ability to understand, remember, and carry out complex instructions; poor ability to behave in an emotionally stable manner; and poor ability to relate predictably in social situations. (Tr. 426.) She also opined that the plaintiff's use of judgment was poor and that her abilities to deal with the public and relate to supervisors and co-workers were fair to poor. (Tr. 427.) Ms. Ott explained that the plaintiff had "gotten quite angry in social settings to the point she [was] ready to fight – hollering, screaming in stores." *Id.* In a letter dated January 6, 2010, Ms. Ott indicated that, while the plaintiff had not undergone "objective testing . . . such as psychiatric testing," she had been pursuing therapy and that "[d]ue to extreme mood lability, anger outbursts, hypervigilance, frequent nightmares and depression, [the plaintiff] would not be a good candidate to be gainfully employed." (Tr. 429.)

On January 26, 2010, the plaintiff reported to Ms. Ott that her fiancé had been killed in a motor vehicle accident but that she had been going to therapy regularly and had been "feeling a lot better recently." (Tr. 435.) In February, she reported that Klonopin was "working like a charm" but that her "biggest issue" was lack of sleep. (Tr. 432.) Ms. Ott prescribed Trazodone for insomnia. (Tr. 434.) In June, the plaintiff reported that she was "doing alright" but was getting more depressed from being in a wheelchair following her hip injury. (Tr. 588.) In July, Ms. Ott noted that the plaintiff's medication was "working well" and that the plaintiff was "[n]ot crying or bawling" and

was not having temper tantrums. (Tr. 587.) Her mental condition appeared to worsen through the rest of 2010 as she dealt with the death of her father and physical conditions including hip and leg pain, hypothyroidism, and hair loss. (Tr. 570-85.) In November, she told Ms. Ott that she was "not good" and was "having trouble with [her] thyroid" and was "[m]ore sick, more angry, [and] arguing more." (Tr. 570.) However, during a phone consultation in January 2011, the plaintiff was "[l]aughing, joking and happy," reporting that she was "finer than a frog hair" and "[f]eeling a lot better." (Tr. 636.) The plaintiff continued to see Ms. Ott through March 2011 (tr. 624-33), when she requested that Ms. Ott adjust her dosage of Lithium to address increased anger, irritability, and mania. (Tr. 624.)

## B. Hearing Testimony

At the hearing on June 16, 2011, the plaintiff was represented by counsel, and the plaintiff and the vocational expert ("VE"), Pedro Roman, testified. (Tr. 28-43.) The plaintiff testified that she graduated high school and has worked as a cashier and truck driver. (Tr. 31-32.) She testified that she is unable to work an eight-hour workday because she cannot stand or sit for long periods of time, explaining that she can stand for only five minutes and sit for only ten minutes at a time. (Tr. 37.) She testified that she "guess[ed]" she could work an eight-hour workday if she were able to sit and stand as needed to alleviate pain. *Id.* The plaintiff testified that she can walk approximately five minutes before needing to take a 15-20 minute break. (Tr. 37-38.) She testified that she cannot lift any weight but acknowledged that her doctors did not restrict her from lifting. (Tr. 38.)

The VE testified that his testimony was consistent with the Dictionary of Occupational Titles and classified the plaintiff's past work as a cashier as light and unskilled and her past work as a truck driver as medium and semi-skilled. (Tr. 39, 42-43.) The ALJ asked whether a hypothetical person with the plaintiff's age, education, and work experience would be able to work if she had the physical ability to perform light work[14] and could understand and remember simple and detailed instructions, maintain attention and concentration for periods of at least two hours, set goals independently, adapt to infrequent change, and interact appropriately with supervisors and peers but could not interact appropriately with the general public and worked better with things than people. (Tr. 40.) The VE testified that such a person could not perform the plaintiff's past relevant work but could work in representative jobs as a small parts assembler, finisher, and garment inspector. (Tr. 41-42.) Next, the ALJ asked whether a hypothetical person with the plaintiff's age, education, and work experience would be able to work if she had the physical ability to perform light work and the mental limitations identified by Ms. Ott in her January 6, 2010 Medical Source Statement. (Tr. 42.) The VE replied that such a person could not perform any job. *Id.*

### III. THE ALJ'S FINDINGS

The ALJ issued an unfavorable ruling on June 27, 2011. (Tr. 12-22.) Based upon the record, the ALJ made the following findings:

1.      The claimant last met the insured status requirements of the Social Security
        Act on December 31, 2009.

---

[14] The ALJ specifically referenced the limitations identified by Dr. Johnson (i.e., occasionally lift twenty pounds, stand and walk for 4-5 hours with normal breaks with assistance for long and prolonged standing and walking, and no sitting restrictions). (Tr. 40, 351.)

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of August 26, 2003 through her date last insured of December 31, 2009 (20 CFR 404.1571 *et seq*.).

\*\*\*

3. Through the date last insured, the claimant had the following severe impairments: low back syndrome, vertigo, right acetabular fracture, bipolar disorder, depressive disorder, anxiety disorder, and personality and intermittent explosive disorder (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

\*\*\*

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except that she could occasionally lift up to 20 pounds; stand and walk four to five hours with normal breaks and may need assistance for prolonged standing or walking. Additionally, she can understand and remember simple and detailed instructions, maintain attention and concentration for periods of at least two hours, interact appropriately with the general public, will work better with things rather than people, can interact appropriately with supervisors and peers, set goals independently and can adapt to infrequent changes.

\*\*\*

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

\*\*\*

7. The claimant was born on August 31, 1962 and was 47 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has

transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Through the dated [*sic*] last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569(a)).

***

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from August 26, 2003, the alleged onset date, through December 31, 2009, the date last insured (20 CFR 404.1520(g)).

(Tr. 14-22.)

# IV. DISCUSSION

## A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching her conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.,* 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)); *Jones v. Comm'r of Soc. Sec.,* 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.,* 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere

scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to support the ALJ's determination. 42 U.S.C. § 405(g). *See, e.g., Houston v. Sec'y of Health & Human Servs*., 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability. *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)). The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques. *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits. *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007). A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be. *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a severe impairment that meets the twelve month durational requirement. 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). *See also Edwards v. Comm'r of Soc. Sec.*, 113 Fed. Appx. 83, 85 (6th Cir. 2004). A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Barnhart v. Thomas*, 540 U.S. 20, 24, 124 S. Ct. 376, 157 L. Ed.2d 333 (2003) (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)). Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b). The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a

showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by [her] impairments and the fact that [she] is precluded from performing [her] past relevant work"); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden of production shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment and that such employment exists in significant numbers in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997)). *See also Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595. *See also Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S. Ct. 2428, 77 L. Ed. 2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in significant numbers in the national

economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009). *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of a plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

## B. The Five-Step Inquiry

In this case, the ALJ resolved the plaintiff's claim at step five of the five-step process. At step one, the ALJ found that the plaintiff had not engaged in substantial gainful activity since her alleged disability onset date. (Tr. 14.) At step two, the ALJ determined that the plaintiff had the following impairments: low back syndrome, vertigo, right acetabular fracture, bipolar disorder, depressive disorder, anxiety disorder, and personality and intermittent explosive disorder. *Id.* At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14-15.) At step four, the ALJ determined that the plaintiff was not capable of performing her past relevant work. (Tr. 20-21.) At step five, the ALJ determined that the plaintiff was capable of performing work as an assembler, finisher, or garment inspector. (Tr. 21-22.)

**C. The Plaintiff's Assertions of Error**

The plaintiff argues that the ALJ erred by failing to properly consider the opinion of nurse practitioner Ott. Docket Entry No. 10, at 11-15. The plaintiff also argues that the ALJ erred by failing to properly consider the opinion of Dr. Blazina. *Id.* at 15-16.

**1. The ALJ properly assessed nurse practitioner Ott's opinion.**

The plaintiff argues that the ALJ erred in evaluating Ms. Ott's opinion. Docket Entry No. 10, at 11-15.

The Regulations provide that the SSA "will evaluate every medical opinion" that it receives. 20 C.F.R. § 404.1527(c). However, every medical opinion is not treated equally, and the Regulations describe three classifications for acceptable medical opinions: (1) nonexamining sources; (2) nontreating sources; and (3) treating sources. A nonexamining source is "a physician, psychologist, or other acceptable medical source[15] who has not examined [the claimant] but provides a medical or other opinion in [the claimant's] case." 20 C.F.R. §§ 404.1502, 416.902. A nontreating source is described as "a physician, psychologist, or other acceptable medical source who has examined [the claimant] but does not have, or did not have, an ongoing treatment relationship with [the claimant]." *Id.* Finally, the Regulations define a treating source as "[the claimant's] own physician, psychologist, or other acceptable medical source who provides [the claimant], or has provided [the claimant], with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." *Id.* An "ongoing treatment relationship" is a

---

[15] The Regulations define acceptable medical sources as licensed physicians, both medical and osteopathic doctors, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. § 404.1513(a).

relationship with an "acceptable medical source when the medical evidence establishes that [the claimant] see[s], or [has] seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for [the claimant's] medical condition(s)." *Id.*

Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating source, as compared to the medical opinion of a non-treating source, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2).[16]  *See also Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. 2010); *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009).  This is commonly known as the treating physician rule.  *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996).

Even if a treating source's medical opinion is not given controlling weight, it is "'still entitled to deference and *must be weighed using all of the factors provided in [20 C.F.R. 416.927] . . . .'" Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. 2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original).  The ALJ must consider:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

---

[16] Effective March 26, 2012, the numbering for the treating physician rules changed.  Section 416.927(d)(2) became section 416.927(c)(2), and the identically worded and interpreted section 404.1527(d)(2) became section 404.1527(c)(2).  *See Johnson-Hunt v. Comm'r of Soc. Sec.*, 2012 WL 4039752, at *6 n.6 (6th Cir. Sept. 14, 2012).

*Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. 2006) (quoting current 20 C.F.R. § 404.1527(c)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5 (citing current 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2)). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* If an ALJ fails to adhere to this procedural requirement, the case should be remanded for further clarification.[17] *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544-45 (6th Cir. 2004).

Under the Regulations, nurse practitioners are not classified as acceptable medical sources but as "other sources."[18] 20 C.F.R. § 404.1513(d). Social Security Ruling ("SSR") 06-03p has noted that:

---

[17] The rationale for the "good reasons" requirement is to provide the claimant with a better understanding of the reasoning behind the decision in his case and to ensure that the ALJ properly applied the treating physician rule. *Wilson*, 378 F.3d at 544 (quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

[18] The Regulations define other sources as:

(1) Medical sources not listed in paragraph (a) of this section (for example, nurse-practitioners, physicians' assistants, naturopaths, chiropractors, audiologists, and therapists);
(2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers);
(3) Public and private social welfare agency personnel; and
(4) Other non-medical sources (for example, spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, and clergy).

20 C.F.R. § 404.1513(d).

> [w]ith the growth of managed health care in recent years and the emphasis on containing medical costs, medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, and licensed clinical social workers, have increasingly assumed a greater percentage of treatment and evaluation functions previously handled primarily by physicians and psychologists. Opinions from these medical sources, who are not technically deemed "acceptable medical sources" under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with other relevant evidence in the file.

Soc. Sec. Rul. 06-03p, 2006 WL 2329939, at *3 (quoted in *Heaberlin v. Astrue*, 2010 WL 1485540, at *4 (E.D. Ky. Apr. 12, 2010)).  SSR 06-03p clarified the treatment of "other sources" by explaining that:

> [a]lthough the factors in 20 CFR 404.1527(c) and 416.927(c) explicitly apply only to the evaluation of medical opinions from "acceptable medical sources," these same factors can be applied to opinion evidence from "other sources." These factors represent basic principles that apply to the consideration of all opinions from medical sources who are not "acceptable medical sources" as well as from "other sources," such as teachers and school counselors, who have seen the individual in their professional capacity. These factors include:
>
> • How long the source has known and how frequently the source has seen the individual;
>
> • How consistent the opinion is with other evidence;
>
> • The degree to which the source presents relevant evidence to support an opinion;
>
> • How well the source explains the opinion;
>
> • Whether the source has a specialty or area of expertise related to the individual's impairment(s); and
>
> • Any other factors that tend to support or refute the opinion.

2006 WL 2329939, at *4-5.  *See also Roberts v. Astrue*, 2009 WL 1651523, at *7-8 (M.D. Tenn. June 11, 2009) (Wiseman, J.).  Finally, SSR 06–03p provides that:

> [s]ince there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical

sources who are not "acceptable medical sources" and from "non-medical sources" who have seen the claimant in their professional capacity. Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.

2006 WL 2329939, at *6 (quoted in *Boran ex rel. S.B. v. Astrue,* 2011 WL 6122953, at *13 (N.D. Ohio Nov. 22, 2011). *See also Hatfield v. Astrue*, 2008 WL 2437673, at *3 (E.D. Tenn. June 13, 2008) ("The Sixth Circuit, however, appears to interpret the phrase 'should explain' as indicative of strongly suggesting that the ALJ explain the weight, as opposed to leaving the decision whether to explain to the ALJ's discretion.") (quoted in *Boran*, 2011 WL 6122953, at *13; and *Brandon v. Astrue*, 2010 WL 1444639, at *9 (N.D. Ohio Jan. 27, 2010)).

The plaintiff visited Ms. Ott, an advanced practice nurse, for mental health treatment from approximately June 2009 to March 2011. (Tr. 425-68, 570-95, 624-36.) During this time Ms. Ott diagnosed the plaintiff with bipolar disorder and PTSD, treated the plaintiff's symptoms, and adjusted her medications as necessary. *Id.* In a Medical Source Statement and explanatory letter, Ms. Ott opined that the plaintiff would be unable to work a full-time job because she suffered from "extreme" anxiety, "severe" depression, nightmares, hypervigilance, flashbacks, anger outbursts, and "extreme mood lability." (Tr. 425-29.) She opined that the plaintiff had "poor" abilities in a number of functional areas, including the activities of daily living; concentration, persistence and pace; adapting to stressful circumstances in a work-like setting; understanding, remembering, and carrying out complex instructions; behaving in an emotionally stable manner; relating predictably in social situations; and using judgment. (Tr. 426-27.) Ms. Ott also opined that the plaintiff had "fair to

poor" abilities in the areas of social functioning, dealing with the public, and relating to supervisors and co-workers. (Tr. 426-27.)

After summarizing the plaintiff's treatment history with Ms. Ott, as well as her opinions regarding the plaintiff's functional limitations (tr. 18-19), the ALJ explained as follows:

> The opinion of Ms. Ott is given little weight because there is no objective evidence to support her findings and her opinion is without substantial support from the other evidence of record and the claimant's reported daily activities, which renders it less persuasive. Ms. Ott opined that the claimant has limited to usually precluded abilities in mental functioning, however she also noted that no objective testing or psychiatric testing was completed. Treatment notes indicated that the claimant's symptoms improved on her medication regimen. The claimant reported to the psychological examiner that she was independently able to complete many daily activities of living with minimal difficulty such as cleaning, caring for herself and family pets, shopping, playing games on her computer and walking her dog.

(Tr. 20.)

The Court concludes that the ALJ appropriately considered the evidence from Ms. Ott. Nurse practitioners are not acceptable medical source as that term is defined in the Regulations, and only acceptable medical sources can give medical opinions. *See* 20 C.F.R. §§ 404.1513(a),(d); 404.1527(a)(2). Consequently, the ALJ was not required to give Ms. Ott's opinion controlling weight as if she were a treating source, and the ALJ only needed to consider her opinion in light of the factors outlined in SSR 06-03p. *See* 2006 WL 2329939, at *4-5. *See also Roberts*, 2009 WL 1651523, at *7-8. The ALJ clearly did so.

The plaintiff raises a number of issues with the ALJ's decision to give Ms. Ott's opinion little weight. Docket Entry No. 10, at 14-15. First, with regard to the lack of objective evidence, the plaintiff argues that her self-reported symptoms are sufficient to support Ms. Ott's opinion. *Id.* at 14. The Court notes, as the ALJ did, that Ms. Ott herself acknowledged the lack of objective

psychiatric testing when formulating her opinion. (Tr. 429.) The lack of objective evidence coupled with the fact that Ms. Ott's conclusions are based largely on the plaintiff's self-reported symptoms can certainly support the ALJ's decision to discount her opinion based on a lack of supportability. *See* 20 C.F.R. § 404.1527(c)(3). *See also* SSR 06-03p, 2006 WL 2329939, at *4-5.

Second, the plaintiff argues that other evidence in the record supports Ms. Ott's conclusions, pointing specifically to her diagnoses, symptomatology, and GAF scores. Docket Entry No. 10, at 14. While the plaintiff indeed points to evidence in the record that supports her claim, she also ignores a wealth of countervailing evidence. For example, while the plaintiff refers to GAF scores showing serious symptoms, she ignores a GAF score of 85 given to her by Dr. Blazina. (Tr. 236, 326, 451.) Additionally, she does not address the ALJ's conclusion that, although the plaintiff suffered from symptoms, her "symptoms improved on her medication regimen." (Tr. 20, 150, 432, 435, 448, 460, 587, 636.) The ALJ, tasked with weighing *all* of the evidence, concluded that Ms. Ott's opinion, which placed more severe limitations on the plaintiff than any other opinion in the record, was not supported by the totality of the evidence.

The plaintiff also argues that the ALJ misconstrued her reports of daily activities to Dr. Blazina. Docket Entry No. 10, at 15. Specifically, the plaintiff argues that she did not tell Dr. Blazina that she performed shopping "independently . . . with minimal difficulty" and that the ALJ should not have discounted Ms. Ott's opinion on this basis. *Id.* Dr. Blazina indicated that the plaintiff told her that "she is able to shop in terms of selecting items and paying for them. She stated however 'my husband goes with me. I won't go alone because I get too nervous.'" (Tr. 327.) The Court agrees with the plaintiff that this statement alone does not indicate, as the ALJ found, that the plaintiff was able to shop independently. However, although the ALJ should not have relied on the

plaintiff's supposed ability to shop alone, the ALJ properly relied on the plaintiff's other reported daily activities, including "cleaning, caring for herself and family pets, . . . playing games on her computer and walking her dog." (Tr. 20.) Thus, even though the ALJ incorrectly referred to the plaintiff's ability to shop independently, a conclusion that is not supported by the record, the ALJ also properly relied on the plaintiff's other reported daily activities which were sufficient to support her conclusion.

The Court concludes that the ALJ appropriately considered Ms. Ott's opinion in light of the factors outlined in SSR 06-03p and provided a satisfactory explanation for her decision to give Ms. Ott's opinion little weight.

### 2. The ALJ properly assessed Dr. Blazina's opinion.

The plaintiff argues that the ALJ erred in evaluating Dr. Blazina's opinion. Docket Entry No. 10, at 15-16. Specifically, the plaintiff argues that the ALJ, who placed "significant weight" on Dr. Blazina's opinion, misconstrued her opinion as including only "mild to moderate limitations" when, in fact, Dr. Blazina opined that the plaintiff's "social interaction abilities are felt to be moderately to possibly severely impaired." (Tr. 328.)

After summarizing the pertinent findings from Dr. Blazina's consultative examination of the plaintiff, the ALJ noted her opinions regarding the plaintiff's functional limitations:

> [Dr. Blazina] opined that the claimant's ability to understand and remember did not appear to be impaired; and her ability to sustain concentration and attention was mildly to possibly moderately impaired. She also opined that her social interaction abilities were moderately to severely impaired; her ability to adapt to changes in her work routine and tolerate workplace stress was moderately impaired and she has the cognitive ability to make simple work-related decisions and transport herself . . . .

(Tr. 18.) Later, when assessing the opinion evidence, the ALJ observed that "Dr. Blazina opined that [the] claimant essentially has mild to moderate mental limitations" and gave her opinion "significant weight." (Tr. 20.) The plaintiff argues that Dr. Blazina did not opine that the plaintiff has "essentially . . . mild to moderate mental limitations" and points to Dr. Blazina's opinion that the plaintiff's "social interaction abilities are felt to be moderately to possibly severely impaired due to characterological issues and poor stress tolerance." Docket Entry No. 10, at 15-16; (tr. 328).

The Court concludes that the ALJ did not err in evaluating Dr. Blazina's opinion. First, when summarizing Dr. Blazina's findings, the ALJ specifically mentioned her opinion regarding the plaintiff's social abilities. (Tr. 18.) Thus, it is apparent that the ALJ was aware of and considered Dr. Blazina's opinions regarding the plaintiff's social abilities. The plaintiff's issue arises only out of the ALJ's later paraphrasing of Dr. Blazina's opinions.

Second, Dr. Blazina's opinion that the plaintiff's social abilities are "moderately *to possibly severely impaired*" is not an unequivocal statement that the plaintiff has more than moderate social limitations, as the plaintiff suggests. *See* Docket Entry No. 11, at 16; (emphasis added). Rather, Dr. Blazina's phrasing indicates that the possibility of greater than moderate social limitations is only speculative.[19] Thus, the ALJ's summary that Dr. Blazina found only "essentially . . . mild to moderate mental limitations" is not on its face incorrect.

Third, although the ALJ gave "significant weight" to Dr. Blazina's opinion, she did not give controlling weight or otherwise adopt Dr. Blazina's opinion in total. Thus, the ALJ was not required to specifically incorporate each of Dr. Blazina's opinions into the plaintiff's RFC. Instead, the ALJ

---

[19] This conclusion is buttressed by Dr. Blazina's assigning the plaintiff a GAF score of 85 (tr. 328), which indicates a "socially effective" person with "[a]bsent or minimal symptoms" and "good functioning in all areas." *See* DSM-IV-TR at 34.

chose to base her hypothetical question to the VE, as well as the plaintiff's RFC, on the mental RFC assessment completed by Dr. de la Torre.  (Tr. 15, 18-20, 40, 344-46.)  Moreover, Dr. de la Torre's assessment regarding the plaintiff's social ability is not inconsistent with Dr. Blazina's.  Specifically, Dr. de la Torre opined that the plaintiff is markedly limited in her ability to interact appropriately with the general public but is, at most, moderately limited with regard to other forms of social interaction.  (Tr. 345-46.)  This opinion is consistent with, if not more limiting than, Dr. Blazina's opinion that the plaintiff's social abilities are "moderately to possibly severely impaired." Significantly, when the ALJ posed a hypothetical question incorporating Dr. de la Torre's opinion, the VE testified that there are jobs available to a person with those limitations.[20]  (Tr. 40-42.)

The ALJ appropriately considered Dr. Blazina's opinion and provided a satisfactory explanation for the weight that she afforded the opinion.  The ALJ did not err by choosing not to incorporate more significant social limitations based on Dr. Blazina's opinion that the plaintiff was "moderately to possibly severely impaired" in that functional area.

## IV.  RECOMMENDATION

For the above stated reasons it is recommended that the plaintiff's motion for "judgment on the pleadings" (Docket Entry No. 9) be DENIED and that the Commissioner's decision be affirmed.

---

[20] The defendant concedes that the ALJ erred by incorrectly finding that Dr. de la Torre determined that the plaintiff has the ability to interact appropriately with the general public (tr. 19) and by including this erroneous finding in the plaintiff's RFC.  Docket Entry No. 11, at 15-16 n.7. The Court agrees with the defendant that the ALJ erred and that the error was harmless because the ALJ's hypothetical question to the VE, upon which the RFC is based, was consistent with Dr. de la Torre's opinion that the plaintiff was unable to interact with the general public.  (Tr. 40-42.)  Even with this limitation accounted for, the VE testified that there were available jobs that such a person could perform.  *Id.*

Any objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation, and must state with particularity the specific portions of this Report and Recommendation to which the objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to appeal the District Court's Order regarding the Report and Recommendation. See *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully Submitted,

JULIET GRIFFIN
United States Magistrate Judge